## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ROBERTS, JIM,
ROBERTS, STACY,[1]

       Plaintiffs,

v.                                   Civ. No. 17-1017-JCH-KK

HARRISON K-9 SERVICES, LLC,
A Nevada Limited Liability Company,

       Defendant.

### PLAINTIFFS' MOTION TO REMAND AND MEMORANDUM IN SUPPORT[2]

Plaintiffs Jim and Tracey Roberts move this Court to remand this case to the Second Judicial District Court of the State of New Mexico and to enter an Order awarding Plaintiffs their attorneys' fees and costs pursuant to 28 U.S.C. § 1447(c) (2011) arising from Defendant Harrison K-9, LLC's wrongful removal. In support of this Motion, Plaintiffs state:

### I.     INTRODUCTION

This action was filed by Plaintiffs Jim and Tracey Roberts ("Plaintiffs" or "the Roberts") against Defendant Harrison K-9 Services, LLC ("Defendant" or "Harrison K-9"), after Plaintiffs purchased a "trained protection shepherd" for $50,000.00 from Defendant that was completely defective, untrained, and medically unfit. Plaintiffs' Complaint alleged counts for revocation of acceptance under the UCC, breach of contract, breach of express warranty, unconscionability, breach of implied warranty of merchantability, breach of warranty of fitness for a particular

---

[1] Defendant removed the case with an erroneous case caption. Jim and Tracey—not "Stacy"—Roberts filed their state court action against Defendant.

[2] Plaintiffs contacted counsel for Defendant and advised of their belief that the removal was wrongful and their intent to file a motion to remand. Defendant did not respond.

purpose, breach of the covenant of good faith and fair dealing, unjust enrichment, and negligent or intentional misrepresentation.[3]

In a transparent attempt to avoid the state court action, Defendant wrongfully removed this case, claiming that the amount in controversy exceeds $75,000.  The removal was improper.  As an initial matter, the notice of removal is procedurally defective as Defendant bases removal on diversity jurisdiction without alleging the citizenship of the members of the Harrison K-9 limited liability company as required, nor the citizenship of Plaintiffs.  For that reason, the Court lacks subject matter jurisdiction.

Importantly, the Court also lacks subject matter jurisdiction because the amount in controversy does not and could not exceed $75,000.  Plaintiffs have incurred less than $75,000 in expenses due to the shepherd dog they purchased from Defendant—they paid $50,000 for the dog and have incurred and will incur less than $25,000 in other expenses (such as the delivery and training fees they paid Defendant and the vet bills they have incurred due to the dog's medical condition).  Under no circumstances could the jury award Plaintiffs more than $75,000 on the basis of the allegations in Plaintiffs' Complaint.  In fact, Plaintiffs expressly disclaimed in their Complaint that the amount in controversy exceeded $75,000, stating: "The Federal District Court for the District of New Mexico does not have diversity of citizenship jurisdiction over this matter pursuant to 28 U.S.C. 1332, as the matter in controversy under this Complaint does not exceed the total sum or value of $75,000, exclusive of interest and costs."  *See* Exhibit A, ¶ 10.  The only thing that has changed since the filing of the Complaint is Plaintiffs' willingness to keep the dog, even though it has no pecuniary value and has in fact become a liability due to its chronic medical condition that Plaintiffs discovered shortly after the dog's delivery.  Plaintiffs originally revoked

---

[3] *See* Exhibit A, Complaint filed in the Second Judicial District Court of New Mexico on December 2, 2016.

acceptance; however, Defendant has repeatedly refused all demands that it take the dog back. Accordingly, it has been almost a year-and-a-half since the dog's delivery and the dog has become a family pet instead of the security dog it was purchased to be—a pet with no pecuniary value. If the dog had any pecuniary value to Plaintiffs, they would not have demanded and obviously would not have been justified in demanding *all* of their money back. Plaintiffs' offer of settlement for the amount in controversy that includes all of their out-of-pocket expenses associated with the dog is—obviously—no way a concession that the dog is "worth $50,000" as Defendant conclusively states in its removal. Of course Plaintiffs could not have made such a concession because they would not be entitled to a refund of the $50,000 they paid for the dog if the dog was "worth $50,000." Defendant's logic is blatantly flawed. The $50,000 Plaintiffs paid for the dog, of course, can only be counted towards the "amount in controversy" once, as Plaintiffs did in formulating the offer of $72,191.57. The jury could never award Plaintiffs more than they paid—they would have no basis for doing so. The Court lacks subject matter jurisdiction.

For all of these reasons, the Court should remand the case to the Second Judicial District state court and award Plaintiffs their attorneys' fees and costs for this blatantly wrongful removal.

## II.   BACKGROUND[4]

In June 2016, after neighbors had been reporting home and vehicular burglaries, thefts, and attempted thefts, it became readily apparent to Mrs. Roberts, who stayed home during the day, that various cars she witnessed driving through and parking in her neighborhood were "casing" houses to target for burglaries. Mrs. Roberts took pictures of the vehicles' license plates and occupants that appeared to be scoping out homes to show to police. One or more of the suspected criminals witnessed Mrs. Roberts taking photos. Soon thereafter, when Mrs. Roberts was getting her mail,

---

[4] All of these facts in the background are derived from the Complaint or in the Roberts' Affidavits and other exhibits that are a part of the State Court record.

another one threatened her by making a gesture with his hand pointing at her like a gun shooting at her.  In fact, one of the Roberts' neighbors *was* shot at in front of her home when she interrupted a car theft transpiring in her driveway, which was reported on the local news.  Security cameras that the Roberts activated that summer recorded footage of men with guns either in hand or in waistband peering through the Roberts' car windows or coming to their front door, guns drawn. Police refused to act, stating that it was not a crime for people to be where they don't belong.  Mr. Roberts worked long hours on their farm every day, leaving Mrs. Roberts home alone. Mrs. Roberts was afraid she had made herself a target by taking the photos.  She and Mr. Roberts both feared for Mrs. Roberts' life, as the crew of suspected criminals continued to case their neighborhood day and night.  It came to the point that Mrs. Roberts was so nervous that she could not sleep and began losing her hair.

Mr. Roberts recalled seeing trained personal protection dogs sold by Defendant and considered purchasing one of their K-9s as Mrs. Roberts' personal security guard dog.  Harrison sells its K-9s for anywhere from $30,000 to several hundred thousand dollars.  Harrison K-9 represents that the high price tag for its personal protection security dogs as compared to other purebred German Shepherds reflects the fact that they are expertly "trained personal protection dogs" that also are great companions and gentle with children as pets.  Harrison K-9 sells its personal protection dogs to consumers all across the country, and indeed the world, and represents it has sold "over 15,000 dogs into homes across the world" in the past 40 plus years it has been in business.  Harrison K-9 advertises its dogs as providing valuable personal protection to their consumers, and warns on its website of crime statistics and research results that showed that security dogs "are the most effective at deterring…criminal intentions."  Based on Harrison K-9's representations in its advertisements and information disseminated through the media, Mr. Roberts called Harrison K-9 and spoke at length with the manager, November Holley, explaining in detail

the threat the Roberts were facing, particularly the on-going threat to life and extreme fear Mrs. Roberts was experiencing. Mrs. Holley represented that Harrison K-9 could sell and deliver to the Roberts an expertly trained security K-9 to provide security and protection. Thereafter, Plaintiffs had three additional conversations with Harrison K-9 in which Harrison K-9 represented the superior quality and training of a Harrison K-9 and that it could deliver the best family watch dog, protector, security dog and companion available.

Plaintiffs then purchased a male purebred personal protection dog "Leo" from Defendant. Defendant personally delivered Leo to Plaintiffs at their Los Ranchos home in New Mexico and conducted a two-day training and demonstration at Plaintiffs' home. During the training, Plaintiffs noticed that Leo had an "odd gait" but Defendant passed it off as the way "true German Shepherds from Germany" walk. However, the Roberts' vet took x-rays of Leo that confirmed he had chronic changes in his left rear hip and diagnosed him as lame. Leo also refused to follow the commands that the trainers taught the Roberts and would, in fact, bite or nip at Mrs. Roberts, whom he was supposed to protect, and growl at her daughter. Although Harrison K-9 refused to recognize that Leo had any defect, it offered to exchange him for another dog.

Plaintiffs now had suspicions about the quality of Harrison K-9 as a company, but agreed to exchange Leo for a female purebred personal protection dog, "Eyra," as Mrs. Roberts continued to fear for her life. Eyra cost ten thousand dollars less than Leo, *i.e.*, $40,000, but Harrison K-9 refused to return to Plaintiffs the $10,000 difference in price between Leo and Eyra, instead, offering to send trainers to Albuquerque, New Mexico, for "touch up" trainings of Eyra after the sale to account for the difference in price. Since they were left without a choice, Plaintiffs agreed. On July 13, 2016, two Harrison K-9 trainers came to New Mexico to deliver Eyra and engage in protection training and demonstration of the dog's purported skills with Mrs. Roberts at Plaintiffs' home in New Mexico.

5

On July 14, 2016, after the two-day training was complete, the Harrison K-9 trainers produced a contract for the sale of Eyra.  Mr. Roberts was not present at the time because he was working on their farm.  Mrs. Roberts noticed that the Contract did not contain a provision regarding the agreed-upon $10,000 worth of additional "touch up" trainings of Eyra, which she objected to. She offered to write-in the provision and sign the Contract, which could be formalized later.  The Harrison K-9 trainers refused to let Mrs. Roberts alter the Contract and represented that they must leave immediately and would take Eyra with them if she did not sign the Contract on the spot. Mrs. Holley was not yet in the Harrison K-9 office to confer with regarding the error in the written Contract.  On this take-it-or-leave it basis and fearing for her life without Eyra present, Mrs. Roberts felt as if she had no choice but to sign the Contract in order to stay safe so she reluctantly signed it at the demand of Harrison K-9, in her home in New Mexico.

Later that day Mrs. Roberts called Mrs. Holley to discuss the Contract's omission regarding the $10,000.  Mrs. Holley told her that the contact Harrison K-9 uses is a standard form and no changes could be made, but that the Contract did indeed have a value of $50,000 and Plaintiffs had Harrison K-9's "word" that the additional trainings would be conducted so that Plaintiffs would enjoy the full value of the $50,000 they had paid Defendant.

The Roberts soon discovered that they had paid $50,000 for nothing more than a pet with medical problems.  The dog had no pecuniary value and had instead become a liability.  There were two separate incidents where Eyra failed to follow the "bark and guard" command when Mrs. Roberts was outside and one of the suspected criminals approached.  After the first, Mrs. Roberts reported Eyra's failure to follow her commands to Harrison K-9, which in turn represented that Eyra must not have felt a "real threat"—leaving Mrs. Roberts questioning the trainer on why the dog gets to decide when to follow commands.  And then it happened the second time later, when Plaintiffs' friend who breeds dogs came over and entered the backyard.  Mrs. Roberts gave Eyra—

6

who had never seen this friend—the command to bark and guard and Eyra failed to follow the command.  Plaintiffs' friend retrieved a bite pillow and a tug (which the Harrison K-9 trainers used in their training demonstrations) from her truck and when Mrs. Roberts gave Eyra the bark and guard command when the friend had these items in her hands, only then did Eyra respond to the commands.  But Eyra again failed to respond to commands once these items were put away.  The only time Eyra ever responded to Plaintiffs' bark and guard commands was during her initial training sessions upon delivery (when the trainers used bite sleeves and other protective gear while training) and when Plaintiffs' friend carried a bite pillow and tug.  Plaintiffs also discovered that Eyra had a medical condition that Harrison K-9 did not disclose to them, for which Plaintiffs have incurred expenses—but these expenses have not and will not exceed $25,000.00.

Defendant has a pattern and practice of selling consumers medically unfit and/or untrained dogs that it misrepresents are professionally trained, exceptional protection security dogs.  Plaintiffs have discovered evidence of other consumers who have paid Defendant tens of thousands of dollars only to receive either medically unfit or untrained dogs from Defendant.  *See* Ex. A, Complaint, ¶¶ 48-50.  One victim's Harrison K-9 dog permitted a gang of robbers to lead it quietly back to a bathroom in the woman's apartment, where they locked it in, while they tied up the dog's owner in her own home and carried out their robbery without the dog ever barking once.  *See* Ex. A, Complaint, ¶ 49.  On information and belief there are many other examples.  *See* Ex. A, Complaint, ¶ 50.  Defendant has once again preyed on an out-of-state consumer by representing, warranting and passing off extremely expensive dogs as being exceptional security dogs when in fact they are neither healthy nor trained to provide the protection that Defendant promises, and Defendant does this in situations that it knows its consumers' need for dog arises from a dangerous situation.  Then, when the consumer complains, Defendant either doesn't respond or offers to replace the defective dog with another (defective) dog.  Defendant has successfully carried on this pattern and practice without

judicial intervention because it has its customers sign a procedurally and substantively unconscionable agreement to arbitrate in South Carolina in Defendant's own backyard, relying on the hurdle its customers must overcome to challenge such an agreement.

On December 2, 2016, the date Plaintiffs filed their lawsuit, Plaintiffs' counsel sent Defendant a letter revoking acceptance of the goods (the dog, "Eyra") and requesting instructions for how to return the dog to Defendant in South Carolina. *See* Exhibit B (December 2, 2016 letter). On December 22, 2016, Plaintiffs' counsel again sent Defendant a letter, advising that acceptance had been revoked and offering to settle for the expenses incurred to that date: $60,916.90. *See* Exhibit C (December 22, 2016 letter).

On January 18, 2017, Defendant filed a Motion to Dismiss based on the arbitration clause in the Contract. At the hearing on Defendant's motion, Defendant admitted, *inter alia*, that the Contract is a one-sided contract of adhesion.[5] On May 9, 2017, Defendant offered to return the $10,000 in price difference between the Leo and Eyra and let them keep Eyra. *See* Exhibit D (5/9/17 e-mail). Plaintiffs responded on May 11, 2017, with the e-mail Defendant attached as Exhibit 3 to its Notice of Removal, requesting $50,000 and accepting the dog back. On June 26, 2017, the State Court denied Defendant's Motion to Dismiss, finding, *inter alia*, that the arbitration clause is both procedurally and substantively unconscionable and that "[i]t is undisputed that it is a contract of adhesion." *See* Exhibit E, Court's June 26, 2017 Order.

On September 25, 2017, Defendant offered Plaintiff $30,000 and to "allow the Roberts to keep the dog." *See* Exhibit F (9/25/17 e-mail). This was the first time Defendant offered Plaintiffs anything above what it actually owed to them and offered to let them keep the dog. The dog has no pecuniary value to Plaintiffs—who believe they are entitled to every cent of $72,191.57 for the price

---

[5] The transcript for this hearing has been ordered and Plaintiffs will attached it to their Reply.

they paid for the Leo and the out-of-pocket expenses associated with both dogs.  But because Defendant wrongfully refused to accept the return of the dog when Plaintiffs demanded they do so back in December of 2016 and again in May of 2017—Plaintiffs have grown attached to the dog as a pet—but nothing more.  The dog has absolutely no pecuniary value to the Plaintiffs, as they maintain the allegations set forth in their Complaint that the dog is unfit medically and untrained to be a personal protection security dog.  It does not follow commands and in fact cowers behind Mrs. Roberts in dangerous situations.  But because Defendant put keeping the dog and getting money on the table, Plaintiffs requested to get all of their money back and keep the valueless dog that in fact has a negative pecuniary value because of her medical condition (plaintiffs actually only offered to take on the liability of a pecuniary loss through their offer to Defendant to keep the dog).  Plaintiffs gained nothing by offering to keep the dog—but even if the dog does have a pecuniary value to Plaintiffs— that amount would simply be *subtracted* from the amount Plaintiffs allege is in controversy (they wouldn't get all their money back)—not *added* to the amount as Defendant has illogically done in its Notice.

After Defendant wrongfully removed this case, Plaintiffs again attempted to settle with Defendant in order to avoid the unnecessary costs of this litigation.  However, although it appeared that Defendant was engaging in good faith negotiations, Defendant instead made an offer less than its prior offer—$20,000 and allowing the Roberts to keep the dog or "$35k and dog returned pending health exam"—a health exam Defendant well-knows the dog could not pass as the dog's medical unfitness forms the basis of some of Plaintiffs' allegations in the Complaint.  *See* Exhibit G (11/1/17 e-mail).  This offer by Defendant reveals that Defendant has recognized the dog's status as liability since its latest offer was to take the dog back only on the condition that it passes a health exam—that Defendant knows it cannot pass.  The dog offers only a liability financially to whoever gets the dog— a net financial loss will accrue because of the dog's medical condition.

9

Defendant's Notice of Removal is unlawful and the Court lacks subject matter jurisdiction. As is explained in the Sections that follow, Defendant cannot meet its "heavy" burden that the amount in controversy exceeds $75,000.  Plaintiffs certainly do not and could not expect to recover at trial an amount higher than the expenses they have incurred as a result of their purchase of the defective dog from Defendant.

### III.    BURDEN OF PROOF

Only state court actions that could have originally been filed in federal court may be removed.  *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987).  On this Motion for Remand, Defendant Harrison K-9 has the burden of proving proper removal, including both that the court has jurisdiction and that Defendant has complied with procedure.  *See Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921); *see also, Johnson v. Circuit City Stores, Inc*., 71 F.Supp.2d 1026, 1029 (N.D.Cal. 1999) (stating that defendant bears burden of establishing federal jurisdiction and must overcome a strict construction of the removal statute against removal); *Parker v. Brown*, 570 F.Supp. 640, 642 (S.D. Ohio 1983) (holding that Defendant bears the burden of showing compliance with procedure).

Importantly, the removal statute is strictly construed *against* removal jurisdiction, with all doubt being resolved in favor of remand.  *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994) ("Defendant's right to remove and plaintiff's right to choose his forum are not on equal footing; for example, unlike the rules applied when plaintiff has filed suit in federal court with a claim that, on its face, satisfies the jurisdictional amount, removal statutes are construed narrowly; where plaintiff and defendant clash about jurisdiction, uncertainties are resolved in favor of remand.");  *see also Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 109 (holding that federal courts must confine their own jurisdiction to the precise limits the statute defines); *see also*

*Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995) (holding that there is a presumption against removal).

Here, on its face, the removal is defective and Defendant does not and cannot meet its heavy burden.

## IV.   DEFENDANT'S NOTICE OF REMOVAL IS PROCEDURALLY DEFECTIVE AND FAILS TO ESTABLISH SUBJECT MATTER JURISDICTION.

Defendant alleges in its Notice of Removal that "The United States District Court has original jurisdiction over this civil action because it is a controversy between citizens of different states and the matter in controversy exceeds $75,000.00 exclusive of interest and costs. 28 U.S.C. § 1332." *See* Doc 1, ¶ 9.  28 U.S.C. § 1332(a) requires averments of *citizenship* to establish federal jurisdiction.  These requirements are "straightforward and the law demands strict adherence to them." *Getty Oil Corp., a Div. of Texaco v. Ins. Co. of N. Am.*, 841 F.2d 1254, 1259 (5th Cir. 1988). However, Defendant has not provided proof sufficient to carry its burden as to Plaintiffs nor as to Defendant Harrison K-9, LLC's citizenship.

First of all, Defendant alleges "Plaintiffs are all residents of the State of New Mexico." Doc. 1, ¶ 2.  "The Supreme Court and the Tenth Circuit have both stated, repeatedly, that 28 U.S.C. § 1332(a) requires averments of citizenship to establish federal jurisdiction, and that averments of *residence* will not satisfy that requirement." *McEntire v. Kmart Corp.*, No. CIV 09-0567 JB/LAM, 2010 WL 553443, at *8 (D.N.M. Feb. 9, 2010) (emphasis added) (citing cases).

Secondly, Defendant alleges: "Defendant Harrison K-9 Security Services, LLC is a Nevada LLC." *See* Doc. 1, ¶ 3.   "[T]he citizenship of a limited liability company is determined by the citizenship of *all of its members*." *D.B. Zwirn Special Opportunities Fund, L.P. v. Mehrotra*, 661 F.3d 124, 125 (1st Cir. 2011) (emphasis added) (internal quotation marks and citation omitted).

11

Therefore, "the allegations in the notice of removal were insufficient to establish that the parties were diverse for purposes of diversity jurisdiction" since Defendant did not allege the citizenship of the members of the Harrison K-9, limited liability company nor the citizenship of Plaintiffs in the Notice. *Id.; see also McEntire*, 2010 WL 553443, at *8. Defendant's Notice is procedurally defective on its face. As Defendant failed to allege citizenship pursuant to 28 U.S.C. § 1332(a), and therefore failed to carry its burden and failed to establish the Court's subject matter jurisdiction, this case should be remanded to State Court.

**V.   THE COURT LACKS SUBJECT MATTER JURISDICTION AS THE AMOUNT IN CONTROVERSY IS LESS THAN $75,000. THE JURY COULD NEVER AWARD THE ROBERTS THE AMOUNT DEFENDANT MANUFACTURED IN ITS WRONGFUL NOTICE OF REMOVAL.**

Beyond the defects in the citizenship allegations, Defendant did not meet its burden to establish that the amount in controversy exceeds $75,000. Plaintiffs' Complaint specifically disclaims that the amount in controversy exceeds $75,000 and made an offer of settlement expressly less than the $75,000 jurisdictional threshold. Defendant wrongfully manufactured the amount in controversy as exceeding $75,000 by adding $50,000 to Plaintiff's demand—that already included the $50,000 price of the dog—since Plaintiffs offered to keep the dog. Defendant did not and obviously could not meet its burden of proving by a preponderance of the evidence that the amount in controversy exceeds $75,000 by adding the price of the dog twice. The flaws in Defendant's logic are thoroughly explained below. There is simply not more than $72,191.57 in controversy because Plaintiffs—under the circumstances alleged in their Complaint—could never recover an amount higher than their out-of-pocket expenses associated with the purchase of the dog.

**A. Plaintiffs' Damages as Alleged in the Complaint Do Not Exceed $75,000, as Plaintiffs Specifically Stated in Their Complaint.**

"Because removal is only permissible when plaintiff's claim could have been filed in federal court originally", the Court should look to the Roberts' Complaint "to determine whether removal was appropriate." *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994). Under Section 1332(a), a federal district court may exercise diversity jurisdiction over a civil action "where the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs." If removal is sought on the basis of this Section, "the sum demanded in good faith in the initial pleading shall be deemed to be the amount in controversy . . . ." 28 U.S.C. § 1446(c)(2) (2011).

Here, Plaintiffs purposefully alleged that the amount in controversy is less than $75,000, stating the following:

> The Federal District Court for the District of New Mexico does not have diversity of citizenship jurisdiction over this matter pursuant to 28 U.S.C. 1332, *as the matter in controversy under this Complaint does not exceed the total sum or value of $75,000*, exclusive of interest and costs. . . . Removal to federal court and the exercise of federal court subject matter jurisdiction would be improper and wrongful.

Exhibit A, ¶ 10 (emphasis added). There is no federal court subject matter jurisdiction on the face of Plaintiff's claim. And Plaintiffs purposefully made an offer of settlement of less than $75,000—not only because less than $75,000 is in controversy, but also with the purposeful intent to remain in State Court. *See* Exhibit H (offering to accept payment of $72,191.57). Obviously Plaintiffs intended to keep this action in State Court and Defendant manufactured an amount in controversy in order to (wrongfully) remove the action to Federal Court.

Indeed, "[f]ederal courts are courts of limited jurisdiction. While a defendant does have a right, given by statute, to remove in certain situations, *plaintiff is still the master of his own claim*." *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994)((emphasis added) (citing cases);

*see also* Wright & Miller, 14A Federal Practice and Procedure § 3702 ("Plaintiff is the master of his or her own claim; if plaintiff chooses to ask for less than the jurisdictional amount, *only the sum actually demanded* is in controversy" (emphasis added)).

Plaintiffs alleged that the amount in controversy did not exceed $75,000 and they made an settlement offer for an amount that did not exceed $75,000.  Plaintiffs are the masters of their own claim—the amount they demanded must be deemed the amount in controversy.

**B.  Defendant Did Not Prove That The Amount in Controversy Exceeds $75,000 by a Preponderance of the Evidence—Nor Could It.  Defendant's Alleged Amount in Controversy is Entirely Unexplained and Has No Basis in Fact or Logic.**

"The defendant seeking removal must establish that federal court jurisdiction is proper by a preponderance of the evidence." *Swiech v. Fred Loya Ins. Co.*, No. CV 16-0101 JB/SCY, 2017 WL 3835807, at *8 (D.N.M. Aug. 31, 2017) (internal quotation marks and citation omitted).  Defendant's burden of proof to establish an amount in controversy that exceeds $75,000 in the face of Plaintiffs' "express claim to less than the minimum jurisdictional sum" is a "heavy one." *Burns*, 31 F.3d at 1095.  Defendant transparently attempted to usurp Plaintiffs' own explicit claim that the amount in controversy is less than $75,000 by "double-dipping" and counting the contract price of the dog *twice* in order to manufacture an amount in controversy that exceeds $75,000.  Defendant did not prove by a preponderance of the evidence that the amount exceeds $75,000 based on flawed, unsupported logic—nor could it.

Defendant cannot meet its burden of overcoming Plaintiffs' express claim that less than $75,000 is in controversy "based on conclusory assertions." Wright & Miller, 14AA Fed. Prac. & Proc. Juris. § 3702.2 (4th ed.); *Varela v. Wal-Mart Stores, E., Inc.*, 86 F. Supp. 2d 1109, 1111 (D.N.M. 2000) (same).  And making conclusory statements is all Defendant has done.

Defendant made the nonsensical conclusory assertions that (1) "Plaintiff seeks to recover, at a minimum, $72,191.57 and keep 'ownership and possession' of a protection dog *worth*

14

*$50,000.00* . . ." Doc 1, Notice of Removal, ¶ 4 (emphasis added); (2) "Plaintiffs' demand of $132,191.57 is a minimum settlement demand"; and (3) "Plaintiffs anticipate recovering more than this amount at the trial of this case." *Id.* ¶ 7.

First of all, Plaintiffs made no such demand of $132,191.57. Defendant presumably intended to add the cost of the dog to the Plaintiff's offer of $72,191.57 (that already included the cost of the dog) to achieve this sum of $132,191.57. The absurdity of adding the same amount at issue twice to achieve a sum that exceeds $75,000 should be apparent on its face:



Even so, adding the cost of the dog again to Plaintiffs' total would equal $122,191.57—not $132,191.57. Therefore, the Notice is also deficient on its face as Defendant utterly fails to explain how it derived the $132,191.57 figure—Plaintiffs certainly did not "demand" that amount as Defendant blindly claims.

Secondly, and (perhaps more) importantly, Plaintiff's unexplained logic is nonetheless flawed as it is based on its other conclusory statement that the dog is "worth $50,000." Obviously, if Plaintiffs are able to recover $72,191.57 in damages, it will be because the jury determined that the dog is *not* "worth $50,000." The dog's "worth" is exactly what is in dispute—that is the precise issue in the case—what *is* the dog worth? At **most** its value is $50,000, what Plaintiffs paid for it. There obviously cannot be a greater value in controversy regarding the dog than what Plaintiffs paid for the dog. But is the dog worth $50,000 or nothing or somewhere in between? Plaintiffs allege that the dog is worth nothing—hence why they want all their money back. If Plaintiffs are correct that the dog is worth nothing or less than nothing and they are awarded $72,191.57 in damages, the dog was not "worth $50,000", wherever the dog goes after that. Whoever gets the dog—whether it's the Roberts, Harrison K-9, or the pound—is not getting a dog "worth $50,000." Under no circumstances could the Roberts in good faith request, nor would the jury have any basis to award, a refund of the $50,000 they paid for the dog and get to keep a dog "worth $50,000"— if they get any portion or all of their money back, it's because the dog was *not* "worth $50,000."

Therefore, Plaintiffs could obviously not "anticipate recovering more than [$132,191.57] at the trial of this case" as Defendant again conclusively states. Doc. 1, ¶ 7. In answering whether Defendant's manufactured sum is the amount actually in controversy, the Court need only ask whether Plaintiffs could have made a claim for $132,191.57 in good faith and whether the evidence would support a jury's verdict of that amount. Obviously not. The jury could not award $132,191.57 in damages—there would be no basis for doing so as that figure far exceeds the recoverable out-of-pocket expenses Plaintiffs have incurred. Nor could the jury award the Roberts $72,191.52 and a dog "worth $50,000"—that would equate to the jury concluding that the dog is not worth $50,000 so Plaintiffs get their money back and awarding them a dog "worth $50,000." The dog cannot be both worth $50,000 and not worth $50,000 at the same time—it is either "worth

$50,000" or it's not.  If Plaintiffs' lose at trial, than the jury will have concluded the dog is "worth $50,000" and Plaintiffs will not get any of their money back.  If Plaintiffs prevail and they get $50,000 in damages for the price of the dog, obviously it will be because the dog is not "worth $50,000."  But under no circumstances would they get to the return of their $50,000 and get to keep a dog "worth $50,000"—which is the logic Defendant apparently uses to manufacture the amount in controversy it alleges by double-dipping and counting the price of the dog twice.

The Roberts' offer to keep the dog was not a concession it is "worth $50,000"—if it was such a concession how could the Roberts in the same breath demand any money back whatsoever for the cost of the dog?  If the dog had any monetary value—that value would be subtracted from the $72,191.52 in issue—not added to it.  There simply can never be more than $50,000 at issue regarding the value of the dog.

For example, imagine if the dog performed somewhat as it was represented and was medically fit, but Plaintiffs still believed they overpaid.  They could offer to keep the dog and claim a refund of half the price they paid because the dog is only worth $25,000.  In that case—with the potential of keeping a dog worth $25,000 and getting a refund of $25,000—there is still only $50,000 at issue.  Now imagine they claimed the dog is only worthy $10,000 to them—it really only follows minimal commands and does not perform as advertised, and they therefore demand $40,000 back.  There is still only $50,000 at issue.  Now imagine they said this dog is worth no more than a dog in the pound, say $100, so they claim $40,900 in damages.  There is still only $50,000 at issue for the dog.  But what actually happened here is the Roberts claimed this dog has a negative sum value—that it is actually a liability.  They demanded all of their money back and offered to take this liability off of Defendant's hands.  If the dog has any monetary value, then the Roberts are not entitled to the full recovery of their expenses.  The more value the dog has, the less the Roberts can recover of the $72,191.52 in expenses.  So the dog is worth zero or $50,000

or somewhere in between. But there is still only a *maximum* of $50,000 at issue regarding the value of the dog, as the following graph illustrates:



In sum, if the dog is indeed "worth $50,000", then there is no refund value and the Roberts are not entitled to the $72,191.52 in damages they claimed. If the dog has no pecuniary value, then the Roberts are entitled to the $72,191.52 in damages they claimed. They only get the $72,191.52 in damages *if the dog has no pecuniary value*. The dog still has no pecuniary value wherever it goes to live after that—it does not suddenly have a value of $50,000 again because someone wants to take care of it. Plaintiffs did not and could not claim $72,191.52 in damages plus a dog "worth $50,000" as Defendant's Notice conclusively states without support or logic.

Significantly, the jury also has no basis in the Complaint to even award the Roberts the dog. Plaintiffs revoked acceptance of the dog in their Complaint. That revocation stands. The fact that, in settlement, Plaintiffs hoped that Defendant might concede that the dog is a liability and choose to let the Roberts keep the dog as a pet is an entirely different matter and unrelated to the amount in controversy for federal court jurisdictional purposes.

But under absolutely no set of facts as alleged in the Complaint could the jury award the Roberts anything more than the $72,191.52 they offered to settle the case for—that is the **only** amount in controversy.  They could never ask the jury to award them twice the amount they paid for the dog—there is no basis in the law or facts as alleged in the Complaint to do so.  So, while it certainly would be nice for the Plaintiffs if $132,191.57 were at issue, the fact remains that it is not.

## VI.    PLAINTIFFS ARE ENTITLED TO ATTORNEYS' FEES AND COSTS ASSOCIATED WITH DEFENDANT'S IMPROPER REMOVAL.

A federal court remanding a removed case to state court "may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). It should award attorney's fees under Section 1447(c) when the removing party lacks an objectively reasonable basis for seeking removal. *See Porter Trust v. Rural Water Sewer & Solid Waste Mgmt. Dist. No. 1,* 607 F. 3d 1251, 1253 (10th Cir. 2010). Given Section 1445(c)'s prohibition against removal, the allegations in the Plaintiffs' Complaint and the law cited herein, it either was or should have been readily apparent to Defendant that it was improper to remove this case to federal court. As a result of the Defendant's insistence on pursuing a legally and factually unfounded demand for removal, Plaintiffs have incurred unnecessary costs, expenses, and attorney fees in filing their Motion to Remand.

Plaintiffs respectfully ask that this Court order the "payment of just costs and any actual expenses, including attorney fees, incurred as a result of [this] removal" as it is authorized to do under federal statutory law. 28 U.S.C. § 1447(c) (2000); *see also Martin v. Franklin Capital Corp*, 546 U.S. 132, 126 S. Ct. 704, 711 (2005) (courts should award attorney's fees under § 1447(c) where the removing party lacked an objectively reasonable basis for seeking removal). Had Defendants simply examined: (1) Section 1445(c)'s prohibition against removal and (2) the

19

straightforward allegations of Plaintiff's Complaint, it would have been clear that there was no objective basis for removal.  Furthermore, it should have been obvious to Defendant that it could not add an amount to Plaintiffs' sum of the amount in controversy that Plaintiff had already included in their sum.  It should have likewise been abundantly clear to Defendant the absurdity of the logic in reaching its figure means that Plaintiffs simultaneously demanded a refund of their money because the dog is not worth $50,000 and offered to keep a dog "worth $50,000."  As such, their argument for removal was objectively unreasonable. Therefore, Plaintiffs' request for fees and costs under 28 U.S.C. § 1447(c) should be granted.

While Plaintiffs need not show a culpable mental state by Defendant in order to be entitled to attorneys' fees and costs, surely the magnitude of substantive and procedural defects in the Notice of Removal support an award of attorneys' fees and costs against Harrison K-9. *See* 28 U.S.C. § 1447(c); *Excell Inc. v. Sterling Boiler & Mechanical, Inc.*, 106 F.3d 318, 322 (10th Cir. 1997) (holding that bad faith is not a prerequisite to award of fees and costs in conjunction with an order to remand).  Harrison K-9's Notice of Removal was clearly designed to delay the proceedings and harass Plaintiffs, as the amount in controversy is obviously less than $75,000. Defendants continue to needlessly drive the costs of these proceedings up—perhaps with the hope that Plaintiffs will give up as the costs start to exceed the recoverable amount in issue.  The Court should take this in account when deciding whether to sanction Defendant.

**VII.    CONCLUSION**

Noticeably lacking in any basis, the Notice of Removal is merely an attempt to prolong and protract this litigation and unnecessarily drive up Plaintiffs' costs.  The amount in controversy does not exceed $75,000, nor could it based in any of the allegations raised in Plaintiffs' Complaint.  Plaintiffs' offer of settlement does not change the amount Plaintiffs could recover at trial.  The dog's "worth" is the heart of the issue at trial.  Plaintiffs maintain that the dog has no

monetary value and they are therefore entitled to recover all of their expenses totaling $72,191.52. If the dog is in fact "worth $50,000" then they of course would not be entitled to recover this amount. The jury simply could never award them more than what they paid under the allegations in the Complaint. The only amount in controversy is what Plaintiffs have paid. If they get to recover that, it will be because the dog is not "worth $50,000." The $50,000 Plaintiffs spent can only be counted once to derive the amount in controversy. For all of these reasons the matter should be immediately remanded to the State Court and the Court should sanction Defendant for its wrongful removal.

> Respectfully submitted,
>
> ATKINSON, BAKER & RODRIGUEZ, P.C.
>
> */s/* Clifford K. Atkinson
> Clifford K. Atkinson
> Justin D. Rodriguez
> Julia E. Crooks
> 201 Third St. NW, Suite 1850
> Albuquerque, NM 87102
> (505) 764-8111
> catkinson@abrfirm.com
> jrodriguez@abrfirm.com
> jcrooks@abrfirm.com
> *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 3rd day of November, 2017 I filed the foregoing *Plaintiffs' Motion to Remand and Memorandum in Support* electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

FEFERMAN & WARREN, LLC
Richard Feferman, Esq.
300 Central Avenue, SW Suite 2000
Albuquerque, NM 87102
(505) 243-7773
rfeferman@msn.com


PLAYER LAW FIRM, LLC
Tucker S. Player, Esq.
1415 Broad River Road
Columbia, South Carolina 29210
803-772-8008
tucker@playerlawfirm.com

ATKINSON, BAKER & RODRIGUEZ, P.C.

*/s/* Clifford K. Atkinson
Clifford K. Atkinson