FILED IN MY OFFICE
DISTRICT COURT CLERK
12/2/2016 1:57:41 PM
James A. Noel
Latoya Grayes

**STATE OF NEW MEXICO**
**COUNTY OF BERNALILLO**
**SECOND JUDICIAL DISTRICT**

ROBERTS, JIM,
ROBERTS, TRACEY,

       Plaintiffs,

v.                                No.   D-202-CV-2016-07571

HARRISON K-9 SERVICES, LLC,
A Nevada Limited Liability Company,

       Defendant.

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiffs Jim and Tracey Roberts, ("the Roberts") through their counsel, Atkinson, Baker & Rodriguez, P.C., and for their Complaint against Defendant Harrison K-9 Services, LLC ("Harrison K-9") allege and complain as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiffs, husband and wife, Jim and Tracey Roberts are residents of the Village of Los Ranchos, State of New Mexico, County of Bernalillo.

2.      Defendant Harrison K-9 is a foreign Nevada Limited Liability Company, with its principal place of business in Aiken, South Carolina.

3.      At all times material to this lawsuit, Defendant Harrison K-9 was conducting business in the State of New Mexico.

4.      Harrison K-9 purposefully initiated activity within the State, by entering into a Contract with Plaintiffs to sell goods that a Harrison K-9 representative personally delivered to Plaintiffs at their home in New Mexico and by conducting trainings with its product over several days at Plaintiffs' home in New Mexico.

1



EXHIBIT
A

5.        Harrison K-9 made several misrepresentations to the Roberts at their home in New Mexico about its personal protection security dogs.

6.        Harrison K-9's conduct was such that it could have reasonably anticipated being subjected to the jurisdiction of the New Mexico courts if it delivered non-conforming goods under the Contract, as it has.

7.        This Court has specific personal jurisdiction over Harrison K-9 pursuant to NMSA 1978, Section 38-1-16(A)(1) & (3)(1988) by transacting business in the State of New Mexico and committing tortious acts in New Mexico, Plaintiffs' cause of action arises out of that business transaction and commission of tortious acts, and Harrison K-9 purposely availed itself of the privilege of conducting these activities in New Mexico sufficient to establish the minimum contacts required to satisfy due process.

8.        Venue is proper in the State Courts of New Mexico pursuant to NMSA 1978, Section 38-3-1(F) (1988).

9.        The State Courts of New Mexico have jurisdiction over this action pursuant to Article VI, § 13 of the New Mexico Constitution.

10.        The Federal District Court for the District of New Mexico does not have diversity of citizenship jurisdiction over this matter pursuant to 28 U.S.C. 1332, as the matter in controversy under this Complaint does not exceed the total sum or value of $75,000, exclusive of interest and costs.  Moreover, this Complaint does not allege any cause of action arising under federal law, and there is no federal question jurisdiction pursuant to 28 U.S.C. 1331.  Removal to federal court and the exercise of federal court subject matter jurisdiction would be improper and wrongful.

11.        Subject matter jurisdiction is only proper in the State Courts of New Mexico.

## <u>FACTS APPLICABLE TO ALL COUNTS</u>

**The Roberts' Security Issues that Led to the Purchase of Harrison K-9s**

12.     In 2016 the Roberts began experiencing security issues and threats to the safety of their persons and property.  The Roberts purchased from Harrison K-9 the personal protection security dogs referenced below, for the purpose of protecting themselves and their property. Plaintiffs disclosed most or substantially all of the facts in ¶ 12 (A-M) below to Harrison K-9.

A.     Early in 2016 the homes in Plaintiffs' subdivision began to be burglarized.

B.     Tracey Roberts was one of the only residents who stayed home during the day, and she frequently worked outside in her front yard.

C.     In June 2016, after neighbors had been reporting home burglaries, stolen cars, thefts, and attempted thefts, it became readily apparent to Tracey Roberts that various cars she witnessed driving through and parking in her neighborhood were "casing" houses to target for burglaries.

D.     Tracey Roberts paid careful attention to any car that drove by that did not belong to her neighbors.  She began to recognize some of the same individuals and it became clear to her that these individuals driving through her neighborhood were part of a large gang of criminals, and she began taking photographs of the gang members, their cars, and their license plates to show police.

E.     The gang members witnessed Tracey Roberts taking photographs of them.

F.     Tracey Roberts took the photographs of the license plates to the police, who ran the plates.  Of the twelve plates Tracey Roberts took photographs of, nine of them came up stolen.

G.     But Police did nothing about the on-going "casing" in her neighborhood.

H.     Tracey Roberts feared she had made herself a target and had trouble sleeping because she feared for her life.  One night, Tracey Roberts witnessed several vehicles "case" her house every twenty minutes.

I.     Then one day, when Tracey Roberts was getting the mail from her mailbox, one of the gang members slowly drove by, glared at her, and made a gesture with his hand as though it was a pistol shooting at her.

J.     Soon thereafter, Tracey Roberts witnessed one of the criminals standing outside her back fence watching her property when she was there alone.

K.     Of the approximately 38 houses in Plaintiffs' subdivision, at least 17 were burglarized.

L.     Plaintiffs' security camera footage showed the criminals with guns in hand on their property on multiple occasions.

13.     Plaintiffs determined that they needed additional security for themselves and their property, especially considering Tracey Roberts was alone on the property during the day, and based on Harrison K-9 advertisements and media, contacted Harrison K-9 to inquire about purchasing one of their "trained personal protection dogs" for to protect the Roberts and their property.

14.     Harrison K-9 is in the business of selling "trained personal protection" dogs.

15.     Harrison sells its K-9s for anywhere from $30,000 to several hundred thousand dollars.  Harrison K-9 represents that the high price tag for its personal protection security dogs as compared to other purebred German Shepherd reflects the fact that they are expertly "trained personal protection dogs" that also are great companions and gentle with children as pets.

16.     Harrison K-9 sells its personal protection dogs to consumers all across the country, and indeed the world, and represents it has sold "over 15,000 dogs into homes across the world" in the past 40 plus years it has been in business.

17.     Harrison K-9 advertises its dogs as providing valuable personal protection to their owners and warns consumers of the following crime statistics on its website:

From the US Department of Justice

- Every **40 seconds another child is reported missing** in the United States.
- Each **day 2300 children are reported missing**. Over 700,000 reported missing annually and **58,000 by non-family members**.
- The **rate of missing children has increased over 444%** since 1982.
- In **80% of the cases where a child was abducted by a stranger**, the first contact between the child and the abductor occurs within **1/4 mile of the victim's home.**
- More than **20% of the children** in the National Center for Missing Children and Exploited Children listed in **non-family abductions are found dead**.
- A **woman is sexually assaulted every two minutes** in America -- 500 each day.
- **One out of every six women** has been the victim of an attempted or completed **rape** in her lifetime.
- The **United States** is the **6th** ranked country for the **highest rape** rates.
- **44% of sexual assault victims** were juveniles **under the age of 18 years** old.
- **29%** of sexual assault victims are **ages 12 to 17** and **15% are under** age **12**.
- **100% of female rapes resulted in injuries** and **75% required medical care** after the attack.
- **One out of five children** between the ages of 12-17 receive **sexual solicitations** online
- On average, **only 39% of rapes and sexual assaults were reported** to law enforcement officials

**Research from the Fraternal Order of Police**
In multiple studies and interviews conducted among convicted sexual assault, robbery and burglary felons they were asked what security measures taken by homeowners were most effective at deterring their criminal intentions. Consistently at the top of the list were security dogs.
When asked why, criminals listed these reasons:
- Canine hearing abilities **pick-up suspicious sounds earlier than alarm systems**.
- Canine **barking alerts homeowners** and neighbors too quickly.
- Criminals **fear of being attacked** by a dog.
- Criminals know **confronting a dog is much more hazardous** than dealing with an alarm system.
- Dogs don't hesitate and they are **not intimidated by the criminal**.

*See* http://harrisonk9.com/info/crimestatistics.cfm.

18.     Based on Harrison K-9s representations in its advertisements and information disseminated through the media, Jim Roberts called Harrison K-9 and spoke at length with the manager, November Holley, and explained in detail most or substantially all of the facts in ¶ 12 of this Complaint, fully informing Harrison K-9 regarding the dangerous circumstances under which Plaintiffs were living under and what their security needs were.

19.     Ms. Holley represented that Harrison K-9 could sell and deliver to the Roberts an expertly trained security K-9 to provide security and protection.  Thereafter, Plaintiffs had three additional conversations with Harrison K-9 in which Harrison K-9 represented the superior quality and training of a Harrison K-9 and that it could deliver the best family watch dog, protector, security dog and companion available.  As a direct, proximate, and reasonably foreseeable result of Harrison K-9's representations, Plaintiffs purchased a purebred male sable European German Shepherd named "Leo vom Haus Bernsmann." ("Leo") for $50,000.  Leo was represented to have a German and internationally certified pedigree.

20.     Plaintiffs paid Defendant an additional $7,073.20 for delivery of Leo to New Mexico and on-site training by Harrison K-9 at Plaintiffs' home in New Mexico.  On June 27, 2016, a Harrison K-9 trainer came to New Mexico and delivered Leo to Plaintiffs at their home.  Harrison K-9 conducted a two-day training session with the Roberts to demonstrate the dog's superior training and skills and teach them the German commands and hand signals to control the dog.

21.     The Roberts noticed that Leo had an "odd gait", but when Jim Roberts pointed it out to the Harrison K-9 employee, the trainer represented that Leo's gait was normal for a "true German" Shepherd from Germany as Leo was.

22.     On June 28, 2016, the Harrison K-9 employee came to Plaintiff's house to continue Leo's training and Plaintiffs again pointed out that Leo was limping and favoring a hind leg, but the Harrison K-9 trainer represented that it was nothing to worry about and completed the training.

23.     Plaintiffs noticed that Leo was continuing to limp and was clearly in pain so on June 29, 2016, Tracey Roberts took Leo to a vet for an exam and x-rays, incurring additional expense.  The x-rays revealed chronic changes in Leo's left rear hip.

24.     After the appointment Tracey called Harrison K-9 and requested copies of Leo's prior x-rays for comparison purposes, which she received on June 30, 2016.  The x-rays had been taken on June 5, 2015 in Germany.  Harrison K-9 also sent a Radiographic Evaluation done on January 19, 2016 by Dr. Barber, the vet Harrison K-9 utilized, who evaluated Leo that day for mild lameness in his left rear leg.  Dr. Barber concluded that on that date, Leo was free from any dysplasia assertedly based on the x-rays from 6 months prior by the doctor in Germany.  The radiographic evaluation papers showed that the evaluation had been performed on a dog with a tattoo number ending in 3225.  Harrison K-9 represented that Leo had a microchip (ending in 6598), not a tattoo ending in 3255.  Pet Link confirmed to Plaintiffs that the 3225 dog and 6598 dog are different dogs, both of which came from Germany.  Harrison K-9 thereafter represented to Plaintiffs that Leo's radiographs for his hips and elbows passed and they could find no medical reason for Leo's limping.

25.     When Plaintiffs contacted Harrison K-9 to notify it of their suspicions and concerns about using an evaluation of a different dog to represent that Leo was free from any condition, Harrison K-9 represented that the dog ID number discrepancy was a simple mistake and that it really was Leo who had been evaluated.  Harrison K-9 also explained that x-rays were not redone because the vet decided it was not worth the danger associated with putting animals under

anesthesia.  Yet Dr. Barber represented to Plaintiffs that the decision not to take new x-rays of Leo when Harrison K-9 suspected lameness in January was made by Harrison K-9, not him.  Upon information and belief, Harrison K-9 used a radiographic evaluation of a different dog to conceal Leo's non-conformities.

26.     Upon information and belief, rather than admitting that Leo had a substantial defect that made him unsuitable for sale, Harrison K-9 instead offered to exchange Leo despite Harrison K-9's representation that nothing was medically wrong with him.  Harrison K-9 e-mailed Plaintiffs videos of two potential replacement options and also represented, "I hope we can figure this out and keep Tracey as safe as possible."

27.     Around this time Leo also began to growl at Plaintiffs' daughter and stopped following commands, which is another concern about Leo that Tracey shared with Harrison K-9.

28.     Plaintiffs were agitated and upset at the possibility of being left without a personal protection security dog and emphasized to Harrison K-9 how important it was to them to get a replacement dog that could fulfill the Contract and keep Plaintiffs and their property as safe as possible.  Despite their concerns with Leo, Plaintiffs reasonably relied on Defendant's representations about the superior quality and protection skills of Harrison K-9's suggested replacement for Leo, and Plaintiffs agreed to replace Leo with a female purebred sable European German Shepherd named "Eyra von Vierhundert Hertz" ("Eyra" or "Purchased Goods").  Eyra assertedly has a German and internationally certified pedigree and a birth date of March 7, 2014. A true and correct copy of her Certificate of Authenticity is attached as Exhibit A.

29.     Eyra cost ten thousand dollars less than Leo, *i.e.*, $40,000, but Harrison K-9 refused to return to Plaintiffs the $10,000 difference in price between Leo and Eyra, instead, offering to

send trainers to Albuquerque, New Mexico, for "touch up" trainings of Eyra after the sale to account for the difference in price.  Since they were left without a choice, Plaintiffs agreed.

30.     On July 13, 2016, two Harrison K-9 trainers came to New Mexico to deliver Eyra and engage in protection training and demonstration of the dog's skills with Tracey Roberts and her son at Plaintiffs' home in New Mexico.

31.     On July 14, 2016, after training was complete, the Harrison K-9 trainers produced a contract for the sale of Eyra ("the Contract"), attached as Exhibit B.  The Contract states, "In consideration for the return of Leo vom Haus Bernsmann by Buyer, Harrison K-9 agrees to exchange and buyer agrees to accept [Eyra], a security dog that has been trained for Personal Protection."  But the Contract did not contain a provision regarding the agreed-upon $10,000 worth of additional "touch up" trainings of Eyra, which Tracey Roberts objected to and offered to write in the provision and sign the Contract, which could be formalized later.

32.     The Harrison K-9 trainers refused to let Tracey Roberts alter the Contract and represented that they must leave immediately and would take Eyra with them if she did not sign the Contract on the spot.  Ms. Holley was not yet in the Harrison K-9 office to confer with regarding the error in the written Contract.

33.     On this take-it-or-leave it basis and fearing for her personal safety without Eyra present, Tracey felt as if she had no choice but to sign the Contract in order to stay safe so she reluctantly signed it at the demand of Harrison K-9, in her home in New Mexico.

34.     Later that day Tracey called Ms. Holley to discuss the Contract's omission regarding the $10,000.  Ms. Holley told her that the contact Harrison K-9 uses is a standard form and no changes could be made, but that the Contract did indeed have a value of $50,000 and

Plaintiffs had Harrison K-9's "word" that the additional trainings would be conducted so that Plaintiffs would enjoy the full value of the $50,000 they had paid for Leo.

35.     On August 16, 2016, Tracey Roberts was outside in her front yard with Eyra when she recognized one of the gang members approaching her on a bicycle.  She gave Eyra the command to bark and guard in order to scare this individual away.  Eyra failed to follow the command and ignored the repeated commands and acted scared instead of protective.

36.     Plaintiffs never had the opportunity to view Eyra's reaction to an actual dangerous situation prior to the August 16th incident.

37.     Plaintiffs had no reason to believe upon delivery of Eyra that she would not perform per her security protection training.

38.     Tracey Roberts reported Eyra's failure to follow her commands to Harrison K-9, which in turn represented that Eyra must not have felt a "real threat."  Plaintiffs reasonably relied on Harrison's representation that Eyra would perform as trained in the future.

39.     On August 26, 2016, Tracey Roberts was taking Eyra for a walk in her neighborhood when a man she recognized as a threat was walking in her direction.  She gave Eyra the command to bark and guard and Eyra failed to respond once again, even as the command was repeated.

40.     In reliance on Harrison K-9's previous representations concerning Eyra's training and promised performance, Plaintiffs did not at that time notify Harrison K-9 of this incident.

41.     In mid-September, Plaintiffs' friend who breeds dogs came over to their house. Eyra had never seen this friend.  When the friend entered the backyard, Tracey Roberts gave Eyra the command to bark and guard and Eyra failed to follow the command.

42.     Plaintiffs' friend retrieved a bite pillow and a tug from her truck and when Tracey Roberts gave Eyra the bark and guard command when the friend had these items in her hands, only then did Eyra respond to the commands.  But when the friend put the bite pillow and tug away and Tracey Roberts gave the command to bark and guard again, Eyra again failed to respond.

43.     The only time Eyra ever responded to Plaintiffs' bark and guard commands was during her initial training sessions upon delivery (when the trainers used bite sleeves and other protective gear while training) and when Plaintiffs' friend carried a bite pillow and tug.

44.     Plaintiffs also discovered that Eyra had a medical condition that Harrison K-9 did not disclose to them, for which Plaintiffs have incurred expenses.  There is no evidence that this condition originated after the dog arrived in New Mexico.  Eyra's condition affects her energy level most of the time and prevents her from providing Plaintiffs the protection they require and for which they purchased the dog.  Thus, Eyra's lack of training cannot be cured because her health condition also prevents her from fulfilling her security dog duties.

45.     Tracey Roberts called Harrison K-9 and left a message for Ms. Holley, who never returned her call.  Tracey Roberts later also called one of the Harrison K-9 trainers regarding Eyra's refusals to follow commands.  He told her he would talk to Ms. Holley and they would call her back, but neither one of them ever did.  Tracey Roberts called and left another message for Ms. Holley with no return call.

46.     Harrison K-9 has a pattern and practice of selling K-9s that are either unfit medically contrary to Harrison K-9's representations or that are not trained as Harrison K-9 represents, or both.

47.     Following Plaintiffs' discovery of Eyra's non-conformities, Plaintiffs have obtained the following information.  Plaintiffs offer the following evidence of Harrison K-9's other wrongs.

### Additional Complaints Made Against Harrison K-9

48.     In 2014, a couple from Idaho filed a complaint against Harrison K-9, the business owner, and November Holley on behalf of themselves and their minor children.  According to the complaint, they purchased a German Shepherd security dog from Harrison K-9 for $45,000.  Shortly after delivery, the dog began to show signs of lameness.  Their Idaho vet was unable to diagnose the dog's condition so Harrison K-9 persuaded the couple to ship the dog back to South Carolina so the vet there, who was familiar with the dog, could evaluate and treat it.  That vet was unable to find anything wrong with the dog.  Harrison K-9 sent the couple a video of the dog, who appeared to be performing in good health so the couple advised Harrison K-9 to ship their dog back.  Harrison K-9 then responded that it had sold their dog.  The couple and their children were devastated.  They wanted their dog back, and if not their dog, then their money back because their dog was "irreplaceable."  Harrison K-9 refused to give their money back; its only offer was to provide a replacement dog.  They also alleged that Harrison K-9 told them that they did not "deserve" their dog.

49.     Another Harrison K-9 customer posted the following review of Harrison K-9 to the popular business review website www.Yelp.com:

If you think your wife is safe. If you think your children are safe. If you think you are safe with a Harrison K9 in your home -- think again!!

Fraud Alert! Buyer Beware!

March 2015 I purchased a $42,000 Harrison K9 about 10 days after my home was burglarized. I was afraid to go home as I live alone. I called in and spoke with November. She sold me a dog she promised would protect me. She told me my dog was a no nonsense girl who's protection

skills were some of the best she had seen and worked with. Patrick, my dog's trainer said the same thing.

I shared with November my biggest fear was had I been home during the burglary, I would have been all alone. She assured me my girl would keep the bad guys out!

I was afraid to go home. I could not sleep. I am afraid of guns & did not want one in my house. November told me my Harrison K9 would be my gun. She'd protect me.

July 2016 I was the victim of a home invasion. I was tied up by 3 armed & masked men. My Harrison K9 didn't bark to notify me 3 men were coming up my driveway or standing at my front door before they entered my house around 11pm at night. My Harrison K9 didn't bite or attack or react. She seemed scared. She was walked into the bathroom by 1 of the invaders. He told me, "next time I'd get a better dog!"

As I was being dragged from my front room into my living room then I was tied up. The story gets worse, but for my own safety & the ongoing police investigation, I cannot share more.

Plz see the LA Times Article -
latimes.com/local/lanow/…

If you think your wife is safe. If you think your children are safe. If you think you are safe with a Harrison K9 in your home -- think again!!

You're simply buying an overpriced pet. I was fooled. Please don't let what happened to me happen to you or your loved ones.

I was told the owner Harrison Prather would call me. Apparently, he's too busy in Thailand to pick up the phone.

(If you read the LA Times article please take a look at the 1st comment posted to the article.
"I guess the dog was not a German Shepherd."
Sadly, she was a $42,000 trained attack German Shepherd. I would have been better off with a Chihuahua. At least they bark.)

*Available at* https://www.yelp.com/biz/harrison-k-9-security-services-aiken, attached as Exhibit

C.  The LA Times article referenced within the review is attached as Exhibit D.

50.     Upon information and belief, other purchasers of Harrison K9s have made complaints against Harrison K-9 concerning the non-conformity of their dogs and their misrepresentations about the dogs' training and medical fitness to perform superior personal protection services.

## COUNT I- REVOCATION OF ACCEPTANCE

51.     All previous paragraphs are incorporated by reference as if fully set forth herein.

52.     Under Section 2-608 of the New Mexico Uniform Commercial Code ("UCC"), a buyer may revoke its acceptance of goods when a non-conformity substantially impaired the value of the goods if the buyer accepted the goods: (a) on the reasonable assumption that the non-conformity would be cured and it has not been seasonably cured, or (b) without discovery of such non-conformity if the buyer's acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

53.     A buyer may revoke acceptance of goods by providing notice to the seller within a reasonable time after the buyer discovers or should have discovered the grounds for revocation and before any substantial change in condition of the goods which is not caused by their own defects.  UCC, § 2-608.

54.     Plaintiffs reasonably assumed, and Defendant represented, that Eyra was expertly trained and in medically fit shape to perform services as a security dog.

55.     As Plaintiffs later discovered, Eyra was unfit medically and did not respond to training commands in dangerous scenarios.

56.     Plaintiffs had no knowledge of such defects and nonconformities, was unaware of these defects, and reasonably could not have discovered them when Defendant delivered Eyra.

57.     Plaintiffs accepted delivery of Eyra without knowledge of the non-conformities and defective medical conditions.

58.     Defendant was aware of the nonconformities and defects at the time of the sale and thereafter.

14

59.     Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

60.     Because all pre-contract execution training of Eyra was conducted with the trainer utilizing either an arm sleeve or bite pillow, it was not discoverable upon delivery that Eyra would not respond to commands outside the presence of an arm sleeve or bite pillow.

61.     Acceptance of Eyra by Plaintiffs was reasonably induced by the difficulty of discovering the non-conformities and defects in the Purchased Goods before acceptance.

62.     When Plaintiffs notified Harrison K-9 of Eyra's non-conformities, Harrison K-9 assured Plaintiffs that Eyra would perform in situations of actual danger and that there must not have been a real threat.

63.     Defendant thus induced Plaintiffs into believing that Eyra would perform as represented and promised.

64.     In addition, Eyra has been diagnosed with a medical condition that significantly impairs her ability to perform her functions as a security dog.

65.     There has been no change in the condition of Eyra not caused by the defects and nonconformities.

66.     Plaintiffs sent Defendant a revocation of acceptance letter demanding instructions for the return of Eyra to Defendant within a reasonable time period after discovering Eyra's defects and non-conformities.

67.     Plaintiffs have complied with all of the requirements of UCC, Section 2-608 in revoking acceptance.

68.     Eyra's inability to perform as a security dog substantially impairs the value of the goods to Plaintiffs and Plaintiffs have revoked their acceptance of the Purchased Goods.  This

15

impairment stems from the fact that Eyra has failed to perform her essential purpose as a security K-9.

69.     Consequently, Plaintiffs are entitled to the return of all monies paid to Defendant as well as incidental and consequential damages incurred as a result of the Purchased Goods' nonconformities, including the costs associated with treating the undisclosed medical condition of the Purchased Goods, and all other damages allowable under law, all in amounts to be proven at trial, but in a total amount less than seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

## COUNT II- BREACH OF CONTRACT

70.     To the extent necessary, Plaintiffs plead this count in the alternative.

71.     All previous paragraphs are incorporated by reference as if fully set forth herein.

72.     Plaintiffs contracted with Harrison K-9 to provide a top-notch, expertly trained security dog.

73.     Harrison K-9 breached its contract with Plaintiffs by providing Purchased Goods that did not satisfy the express required performance parameters.

74.     Unlike with Leo's non-conformities, Defendant Harrison K-9 did not attempt to cure the defects and non-conformities in Eyra and instead initially assured Plaintiff that Eyra had no defects or non-conformities and was functioning in full capacity and as trained, until Harrison K-9 stopped responding at all to Plaintiffs.

75.     Plaintiffs have been damaged as a direct, proximate and reasonably foreseeable result of Harrison K-9's breach of contract and other acts and omissions and are entitled to judgment therefor as pleaded below.

## COUNT III- BREACH OF EXPRESS WARRANTY

76.     To the extent necessary, Plaintiffs plead this count in the alternative.

77.     All previous paragraphs are incorporated by reference as if fully set forth herein.

78.     Under the New Mexico UCC, Section 2-313, Express warranties by the seller are created as follows:

(a) any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise;

(b) any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description;

(c) any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

NMSA 1978, § 55-2-313 (1961).

79.     Defendant made or gave to Plaintiffs certain specific affirmations of fact, promises and/or descriptions which related to the Purchased Goods.

80.     Defendant's affirmations of fact, promises and descriptions became part of the basis of the bargain and created an express warranty that the Purchased Goods would conform to those affirmations of fact, promises and descriptions.

81.     Plaintiffs relied on Defendant's affirmations of fact, promises and descriptions regarding the higher price and value of Defendant's K-9s as expertly trained purebred security dogs as compared to other, non-trained purebred dogs.

82.     After Defendant delivered the Purchased Goods, one or more of Defendant's affirmations of fact, promises and/or descriptions regarding the characteristics and performance of the goods were discovered by Plaintiffs to be false.

83.     Defendant breached express warranties to Plaintiffs.

84.     The Contract purports to disclaim any express warranties.

85.     Express warranties cannot be disclaimed under the UCC.  *See* UCC, § 2-313, cmts. 1, 4.

86.     Plaintiffs have been damaged as a direct, proximate and reasonably foreseeable result of Defendant's breach of express warranty and other acts and omissions and are entitled to judgment therefor as pleaded below.

### COUNT IV- CONTRACT VOID FOR UNCONSCIONABILITY

87.     To the extent necessary, Plaintiffs plead this count in the alternative.

88.     All previous paragraphs are incorporated by reference as if fully set forth herein.

89.     NMSA 1978, Section 55-2-302 provides:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

90.     The Contract is substantively unconscionable because Plaintiffs paid $50,000 (plus the cost of training) for a security and protection dog that will not perform as promised and has no value.

91.     The Contract provides that under no circumstances will Defendant provide a monetary refund.

92.     The Contract provides that under certain conditions, the purchaser can exchange the purchased dog one time for a replacement dog.

93.     Plaintiffs already received one replacement dog due to the medical unfitness and lack of following commands of the first dog they purchased.

94.     Defendant replaced the first dog with another medically unfit, untrained dog.

95.     Defendant has demonstrated that it incapable of fulfilling the Contract by providing a medically fit, expertly trained security dog that will respond to bark and guard commands outside the presence of a bite pillow or arm sleeve.

96.     The Contract is procedurally unconscionable because Defendant told Tracey Roberts that the terms could not be amended, despite the Contract's failure to reduce the agreed-upon terms in writing, and Tracey Roberts was forced to sign the Contract under duress on a take-it-or-leave-it basis or risk her personal security.

97.     The arbitration provision within the Contract is likewise procedurally unconscionable because Defendant represented that the Contract was non-negotiable and no terms could be modified or added; and Defendant was prepared to take the dog back to South Carolina knowing Plaintiff's security situation.  This literal "take it or leave it" basis is quintessential procedural unconscionability.

98.     The arbitration provision is also substantively unconscionable because the Contract is a consumer contract that requires consumers from all across the country (and world) to travel to South Carolina to arbitrate any claims in the same county as Defendant's headquarters.

99.     Because the Contract is unenforceable for unconscionability, Plaintiff seeks rescission of the Contract and damages in an amount to be determined at trial, but in a total amount less than seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

**COUNT V- BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

100.     To the extent necessary, Plaintiffs plead this count in the alternative.

101.     All previous paragraphs are incorporated by reference as if fully set forth herein.

102.     Under Section 2-314 of the New Mexico UCC, a warranty of merchantability is implied in all contracts for sale unless this warranty is expressly disclaimed.  *See* NMSA 1978, § 55-2-314.

103.     The Contract purports to disclaim the warranty of merchantability.

104.     But because the Contract is unconscionable (Count IV), the disclaimer is unenforceable.

105.     The Purchased Goods Harrison K-9 sold to Plaintiff constitute "goods" as that term is defined by the New Mexico UCC.  NMSA 1978, § 55-2-205 (1961).

106.     Defendant is a "merchant," as that term is defined by the New Mexico UCC, with respect to the Purchased Goods.  NMSA 1978, § 55-2-204 (2006).

107.     The Purchased Goods as supplied by Defendant and sold to Plaintiffs were not merchantable, and otherwise would not pass without objection in the trade under the Contract description and would not fit for the ordinary purpose for which such goods are intended.

108.     Upon the sale of Eyra to Plaintiffs, Defendant breached the implied warranty of merchantability.

109.     Plaintiffs have been damaged as a direct, proximate and reasonably foreseeable result of Defendant's breach of the warranty of merchantability and other acts and omissions and are entitled to judgment therefor as pleaded below.

## COUNT VI- BREACH OF WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

110.     To the extent necessary, Plaintiffs plead this count in the alternative.

111.     All previous paragraphs are incorporated by reference as if fully set forth herein.

112.     Pursuant to Section 2-315 of the New Mexico UCC, where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that

the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified, an implied warranty that the goods shall be fit for such purpose.

113.     The Contract purports to disclaim the warranty of fitness for a particular purpose.

114.     But because the Contract is unconscionable (Count IV), the disclaimer is unenforceable.

115.     Plaintiffs purchased Eyra for a particular purpose, *i.e.*, security guard dog.

116.     At all relevant times, Plaintiffs notified Defendant and Defendant knew of the particular purpose for which Eyra was purchased.

117.     At all relevant times, Defendant knew that Plaintiffs would rely, and that Plaintiffs in fact did rely, on Defendant's skill and judgment to select and furnish suitable goods, as well as Defendant's representations regarding those goods.

118.     The Purchased Goods supplied by Defendant were neither fit nor suitable for the purpose for which they were intended.

119.     Upon the sale of the Purchased Goods to Plaintiffs, Defendant breached the implied warranty of fitness for a particular purpose.

120.     Plaintiffs have been damaged as a direct, proximate and reasonably foreseeable result of Defendant's breach of warranty of fitness for a particular purpose and other acts and omissions and are entitled to judgment therefor as pleaded below.

### COUNT VII- BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

121.     To the extent necessary, Plaintiffs plead this count in the alternative.

122.     All previous paragraphs are incorporated by reference as if fully set forth herein.

123.     Plaintiffs have fully complied to the extent able with their duties and obligations under the Contract.

124.     Pursuant to the terms in the Contract, Defendant had a legally binding obligation to supply a K-9 expertly trained and medically fit to perform security guard dog services.  Plaintiffs relied upon such covenant and duty.

125.     Defendant supplied a medically unfit K-9 that was untrained to perform security guard dog services in actual dangerous circumstances.

126.     Defendant has substantially refused to communicate regarding the Purchased Goods' defects and non-conformities.

127.     Defendant's failure to fulfill the terms of the Contract and refusal to communicate regarding the Purchased Goods' defects and non-conformities breach the duty of good faith and fair dealing.

128.     Plaintiffs have been damaged as a direct, proximate and reasonably foreseeable result of Defendant's breach of the implied covenant of good faith a fair dealing and other acts and omissions and are entitled to judgment therefor as pleaded below.

## COUNT VIII- UNJUST ENRICHMENT

129.     To the extent necessary, Plaintiffs plead this count in the alternative.

130.     All previous paragraphs are incorporated by reference as if fully set forth herein.

131.     Plaintiffs paid over $50,000 to Harrison K-9 for what Harrison K-9 represented was an expertly trained and medically fit security guard dog.

132.     What Plaintiffs actually received was Eyra, valued at $40,000, who was worthless to Plaintiffs for the purpose she was purchased.

133.     Harrison K-9 knowingly and voluntarily retained the benefit of the over $50,000 Plaintiffs have paid to it to date without providing a dog fit to provide security services to Plaintiffs as advertised and warranted.

134.     As a result of Defendant's wrongful and fraudulent acts and omissions, as set forth above, pertaining to the misrepresentations about Eyra's medical fitness of security training and abilities, Harrison K-9 charged Plaintiffs a higher price for their security dog than the dog's true value and Defendant obtained monies rightfully belonging to Plaintiffs.

135.     Defendant was thus enriched at the expense of Plaintiffs, and it would be against equity and good conscience for Defendant to retain these wrongfully obtained profits.

136.     Plaintiffs have been damaged as a direct, proximate and reasonably foreseeable result of Defendant's unjust enrichment and other acts and omissions and are entitled to judgment therefor as pleaded below.

### COUNT IX- NEGLIGENT OR INTENTIONAL MISREPRESENTATION

137.     To the extent necessary, Plaintiffs plead this count in the alternative.

138.     All previous paragraphs are incorporated by reference as if fully set forth herein.

139.     Defendant knew that it was critical to Plaintiffs to receive an expertly trained personal security dog that could protect their home and persons and keep them as safe as possible.

140.     Defendant negligently or intentionally made materially false representations of the true nature of the quality of the Purchased Goods for the purpose of inducing Plaintiffs to purchase the Purchased Goods.  Defendant knew or should have known that its representations regarding its security dogs' capabilities to protect and guard their owners in dangerous situations and other representations were false or it made such representations recklessly.

141.     Defendant intended for Plaintiffs to rely on such false statements, representations, and disclosures of fact, or Defendant knew or should have known that Plaintiffs would rely upon its negligently or intentionally materially false representations.

142.     Plaintiffs justifiably relied on such false statements, misrepresentations and disclosures of fact, which played a material and substantial part in leading Plaintiffs to purchase the Goods.

143.     Plaintiffs have been damaged as a direct, proximate and reasonably foreseeable result of Defendant's negligent or intentional misrepresentations and other acts and omissions and are entitled to judgment therefor as pleaded below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment:

1) Against Defendant in an amount to be determined at trial but not exceeding the total sum or value of $75,000, exclusive of interest and costs, and

2) For such other and further relief as the Court deems appropriate, including without limitation applicable costs.

### Jury Demand

Plaintiffs request a trial by jury before a jury of six persons, on all claims triable to a jury. Plaintiffs have deposited their jury fee in the amount of $150.00.

Respectfully submitted,

ATKINSON, BAKER & RODRIGUEZ, P.C.

*/s/ Julia E. Crooks*
Julia E. Crooks
Clifford K. Atkinson
201 Third Street NW, Suite 1850
Albuquerque, NM 87102
(505) 764-8111
jcrooks@abrfirm.com
catkinson@abrfirm.com
*Attorneys for Plaintiff*

24



# *HARRISON K-9 SECURITY SERVICES, LLC*
## *112 Farmingdale Court*
## *Aiken, South Carolina, 29805*
## *Ph: 803-649-5936 / Fax: 803-649-3034*

## Service Assistant/Service K-9 Certification

### July 13, 2016

As of July 13, 2016, *Eyra von Vierhundert Hertz* microchip# 981189900053050 serial number#2302678 described as a sable European German Shepherd female, has completed the requirements set by the American Guide Dog Association as a Service/Assistance K-9. She is trained in the abilities to detect seizures and retrieve telephone upon command. She works either on leash or body harness to support handler for balance. K-9 is further trained in multiple languages including English, German and Silent hand signals. She follows traffic regulations and sits at curbs, traffic lights and immediately upon request from handler in addition to other specialized training as required.

*Eyra von Vierhundert Hertz* certifications and registrations include the following:

Verein Fur Deutsche Schaferhunde (SV)
Verband furdas Deutsche Hundwesen e. V (VDH)
Federation Cynologique Internationale (FCI)
Weltunion der Vereine fur Deutsche Shaferhunde (WUSV)
Osterreichischer Verein fur Deutsche Schaferhunde (OKV-INT)

Begleithunde
IPO-I
Jugendklasse SG Rated
Service/Assistance

Harrison K-9 Security Services, LLC. Certified Trainer

Notary Public of South Carolina
My commission expires February 25th, 2026



# HARRISON K-9 SECURITY SERVICES, LLC.

*112 Farmingdale Court*
*Aiken, South Carolina 29805*
*Ph: (803) 649-5936    fax: (803) 649-3034*

## BILL OF SALE
### July 13, 2016

One Female sable European German Shepherd Eyra von Vierhundert Hertz is exchanged as a replacement for one Male black and tan European German Shepherd Leo vom Haus Bernsmann. Eyra is exchanged as an Executive Companion dog.

She is given a six-month replacement guarantee covering genetic disorders and a sixty-day unconditional suitability replacement guarantee. The dog must be returned in the same or better condition as she was on the date of purchase for replacement guarantee to be effective.

**Sire:**    *Arrex vom Westervenn*

**Dam:**    *Daika von der Rheinhöhe*

**DOB:**    *March 07, 2014*

**Chip:**    *981189900053050*

*\*\*Harrison K-9 Security Services, LLC., regrets we do not issue monetary refunds for Trained Adult dogs\*\**



EXHIBIT
B

# HARRISON K-9 SECURITY SERVICES, LLC
## SALES AGREEMENT
### THIS CONTRACT IS SUBJECT TO ARBITRATION PURSUANT TO S.C. CODE 15-48-10 ET. SEQ.

This agreement is made the ___13th___ day of _July  2016___ between Harrison K-9 Security Services, LLC., hereinafter referred to as "Harrison K-9", and Tracey and Jim Roberts herein after referred to as "Buyer".

In consideration for the return of Leo vom Haus Bernsmann by buyer, Harrison K-9 agrees to exchange and buyer agrees to accept **Eyra von Vierhundert Hertz # 981189900053050,** a security dog that has been trained for Personal Protection.

## 1.    LIMITED WARRANTY

Harrison K-9 believes the dog is free from congenital health defects that would prevent the dog from performing its duties for a period of six-months from the date the dog is first delivered to buyer. In the event that a congenital health defect is discovered that prevents the dog from performing its duties, Harrison K-9 will replace the dog ONE time, at no additional charge to buyer with a K-9 of equal value, provided that the dog is returned prepaid at the buyer's expense within seven (7) days of diagnoses to Harrison K-9.  If a replacement dog is necessary, the buyer agrees to be bonded to all the terms and conditions of the original agreement.  Buyer also agrees the second dogs guarantee will be a continuance of the first dog's original guarantee. Buyer agrees acceptance of replacement dog does not constitute a second agreement and in no way voids the terms and conditions of the original contract.

## 2.    LIMITATION ON WARRANTIES

Harrison K-9 makes no express or implied warranties concerning the dog sold under the agreement other than those set forth above.  Any affirmations or representations made by Harrison K-9 or Harrison K-9's agents were made for illustrative purposes only and do not constitute warranties on the original dog or any replacement dog. Harrison K-9 regrets we do not issue monetary refunds for purchases of Personal Protection trained Security dogs.

HARRISON K-9 MAKES NO WARRANTY OF MERCHANTABILITY NOR WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE FOR THE DOG SOLD HEREUNDER.

By initialing below I understand this is an advanced trained security dog and I am confident of my abilities to handle said dog.

Buyer's Initials_____          Buyer's Initials_____

**HARRISON K-9 Sales Agreement**
**Page 2 of 3**

**3.     SUITABILITY**
Harrison K-9 agrees that within sixty-days of buyer taking delivery of the dog that should buyer not be satisfied with the dog Harrison K-9 will replace the dog one time with a k-9 of equal value, at no additional charge to buyer, provided the dog is returned prepaid at the buyer's expense, and further that the buyer has followed the instructions in the owner's manual. If a replacement dog is necessary, the suitability warrant will extend until the original sixty-day suitability guarantee expires. Replacement dogs must be selected within one-year of the return of the original dog. If dog is not selected within one-year time frame, Harrison K-9 reserves the right to keep all monies paid and void contract for future replacement. Harrison K-9 strongly recommends that all adult members of the household participate in the two-day handler's training course. Failure of all adult members to participate in the two-day handler's training course could void the suitability guarantee.

Harrison K-9 Security Services LLC., should be notified in writing of any problems with the dog immediately. The dog is not to be taken to another trainer or training facility without express written authorization from Harrison K-9, and buyer has not subjected the dog to physical or mental abuse. Buyer is responsible for the well-being of the dog. The dog must be returned to Harrison K-9 in the same or reasonably same condition as when received. Returning the dog will immediately terminate buyer's ownership of said animal and release Harrison K-9 to freely place or resale the dog at Harrison K-9's discretion to another buyer. (At this time all original European paperwork, if applicable, must be returned via Certified mail, Federal Express, one of the overnight services or delivered in person within 5 days of dog being returned to Harrison K-9 Security Services, LLC. Failure to return original European paperwork, if applicable, within the specified time frame will immediately void any and all warranties or guarantees expressed or implied.)

**4.     INDEMNIFICATION BY BUYER**

The parties agree they are purchasing a dog trained for security purposes and that upon departure of the dog from Harrison K-9's facility Buyer assumes full responsibility for the dog, its maintenance, health, and conduct. Buyer agrees to maintain the dog in a safe, secure and humane environment. Buyer hereby agrees to indemnify and hold harmless, Harrison K-9, its officers, shareholders, directors, employees and agents, from and against all and any loss, liability, claim (whether alleged to be based upon errors in judgment, negligence, gross negligence, strict liability or breach of duty by Buyer or Harrison K-9, its officers, shareholders, directors, employees, and agents), legal proceeding, deficiency, expense, including without limitation, reasonable attorneys' fees, or damage, including without limitation, injuries (whether to body or property) sustained by any person, relating to, arising from or in connection with (I) any act or failure to act of Buyer, (II) any act or failure to act of the dog, (III) any act or failure to act of Harrison K-9, its officers, shareholders, directors, employees and agents, or (IV) any violation of any municipal, state, or federal laws or regulations by the Buyer or the dog.

By initialing below I understand this is an advanced trained security dog and I am confident of my abilities to handle said dog.

Buyer's Initials_____          Buyer's Initials_____

HARRISON K-9 Sales Agreement
Page 3 of 3

5.   **ATTORNEYS FEES AND COSTS**

If any action, arbitration proceeding, action at law or in equity is necessary to enforce or interpret the terms of this agreement, the prevailing party shall be entitled to reasonable attorney's fees and costs in addition to any other relief to which such party may be entitled.

6.   **ARBITRATION**

Any dispute or controversy arising out of or related to this sales agreement or the subject matter thereof shall be finally settled by binding arbitration to be conducted pursuant to the then-current rules of the South Carolina Uniform Arbitration Act before three arbitrators, one selected by each party to this sales agreement and the third selected by the other two arbitrators.  The arbitral proceeding shall be held in Aiken County, South Carolina.  This sales agreement and any claim or controversy arising out of or related to it shall be governed by and construed according to the laws of the State of South Carolina, exclusive of its conflict of law provisions.  The parties agree that this provision shall constitute a waiver of a right to trial by jury or non-jury with respect to any dispute or controversy arising out of or related to this sales agreement.

7.   **ENTIRE AGREEMENT; SEVERABILITY**

This sales agreement sets forth the entire understanding of the parties with respect to the subject matter thereof.  This sales agreement supersedes all prior representations, agreements and understandings, whether written or oral, between the parties hereto with respect to the subject matter thereof.  If any provision of this sales agreement, or portion thereof, shall be adjudged by any court of competent jurisdiction to be invalid or unenforceable for any reason whatsoever, such determination shall be confined to the operation of the provisions at issue and shall not affect or invalidate any other provision of this sales agreement. This sales agreement is valid only to buyer listed and is not transferable to another party. This sales agreement cannot be modified except in writing signed by all parties to this sales agreement.

Harrison K-9 will make every reasonable effort to ensure buyers complete satisfaction with the dog.  Therefore, Harrison K-9 makes its staff and trainers available for consultation, advice and refresher training courses, for both buyer and dog, at a nominal fee for the life of the dog. By signing, the agreement below buyer agrees they are satisfied with the training received and are confident of their abilities to handle the dog.

BUYER IS AWARE ANY AND ALL PHOTOS AND/OR VIDEOS ISSUED TO THEM FROM HARRISON K-9 EITHER BEFORE OR AFTER PURCHASE OF DOG ARE FOR PRIVATE USE ONLY. THESE PHOTOS AND VIDEOS ARE COPYRIGHTED AND REMAIN THE PROPERTY OF HARRISON K-9 SECURITY SERVICES, LLC AND CANNOT BE USED FOR PUBLICATION OR DISPLAY ANYWHERE WITHOUT THE EXPRESS WRITTEN PERMISSION OF HARRISON K-9 SECURITY SERVICES, LLC.
HARRISON K-9 IS A REGISTERED TRADEMARK. REG. 78900957

**HARRISON K-9 SECURITY SERVICES, LLC.**

By: _Rob A Hbr_ ___ Date: _7-13-16_       Buyer:_____ Date:_____
Harrison K-9 Representative                  Tattoo or I.D. _ _____ 981189900053050___
Witness:_____             Buyer:_____ Date:_____
ID#_____              Tattoo or I.D._____ 981189900053050___



**Find** tacos, cheap dinner, Max's     **Near** San Francisco, CA       Log In

Home    About Me    Write a Review    Find Friends    Messages    Talk    Events

**Today is a holiday!** Business hours may be different today.

# Harrison K-9 Security Services ✓ Claimed



★★★★☆ 4 reviews    ▫ Details

Security Systems ✎ Edit



🗺 Map data ©2016 Google

📍 **68 Farmingdale Ct**     ✎ Edit
   **Aiken, SC 29805**
✦ Get Directions
📞 (803) 649-5936
💬 Request a quote



See all 6 photos

The Wonderful Nadja, 2002-2014
by Mike A.

Sponsored   ⓘ

## Recommended Reviews for Harrison K-9 Security Services

✦ **Your trust is our top concern,** so businesses can't pay to alter or remove their reviews. Learn more.   ✕

| Search within the reviews |

Sort by Yelp Sort ▾    Language **English (4)** ▾



With so few reviews, your opinion of **Harrison K-9 Security Services** could be huge. Start your review today.

---

🗨 **Request a Quote**

You can now request a quote from this business directly from Yelp

---

🕐 Today **9:00 am - 4:00 pm** Open now

### Hours

| | |
|---|---|
| **Mon** | 9:00 am - 5:00 pm |
| **Tue** | 9:00 am - 5:00 pm |
| **Wed** | 9:00 am - 5:00 pm |
| **Thu** | 9:00 am - 5:00 pm |
| **Fri** | 9:00 am - 4:00 pm   Open now |
| **Sat** | Closed |
| **Sun** | Closed |

✎ Edit business info

### More business info

Accepts Credit Cards **Yes**

 Lisa L.
First to review

### You might also consider

### Browse nearby

🍴 Restaurants
🍸 Nightlife
🛍 Shopping
••• Show all

[EXHIBIT C]



**T J.**
**Beverly Hills, CA**
0 friends
5 reviews

★☆☆☆☆ 8/15/2016

If you think your wife is safe. If you think your children are safe. If you think you are safe with a Harrison K9 in your home -- think again!!

Fraud Alert! Buyer Beware!

March 2015 I purchased a $42,000 Harrison K9 about 10 days after my home was burglarized. I was afraid to go home as I live alone. I called in and spoke with November. She sold me a dog she promised would protect me. She told me my dog was a no nonsense girl who's protection skills were some of the best she had seen and worked with. Patrick, my dog's trainer said the same thing.
I shared with November my biggest fear was had I been home during the burglary, I would have been all alone. She assured me my girl would keep the bad guys out!
I was afraid to go home. I could not sleep. I am afraid of guns & did not want one in my house. November told me my Harrison K9 would be my gun. She'd protect me.

July 2016 I was the victim of a home invasion. I was tied up by 3 armed & masked men. My Harrison K9 didn't bark to notify me 3 men were coming up my driveway or standing at my front door before they entered my house around 11pm at night. My Harrison K9 didn't bite or attack or react. She seemed scared. She was walked into the bathroom by 1 of the invaders.
He told me, "next time I'd get a better dog!"
As I was being dragged from my front room into my living room then I was tied up. The story gets worse, but for my own safety & the ongoing police investigation, I cannot share more.

Plz see the LA Times Article -
latimes.com/local/lanow/…

If you think your wife is safe. If you think your children are safe. If you think you are safe with a Harrison K9 in your home -- think again!!

You're simply buying an overpriced pet. I was fooled. Please don't let what happened to me happen to you or your loved ones.

I was told the owner Harrison Prather would call me. Apparently, he's too busy in Thailand to pick up the phone.

(If you read the LA Times article please take a look at the 1st comment posted to the article.
"I guess the dog was not a German Shepherd."
Sadly, she was a $42,000 trained attack German Shepherd. I would have been better off with a Chihuahua. At least they bark.)

# Sherman Oaks woman escapes after robbers invade her home and tie her up



Police are searching for three armed intruders who tied up a Sherman Oaks resident during a home invasion robbery Tuesday night.

By **Erica Evans**

JULY 27, 2016, 1:50 PM

**T**hree armed suspects invaded a woman's home, tied her up and robbed her home in Sherman Oaks on Tuesday night, police said. The woman managed to escape, but so did the robbers, unfortunately.

The crime was reported to have occurred around 11 p.m. in the 3900 block of Ventura Canyon Avenue. Police said that the victim, a woman in her mid-30s who lives alone with her dog, opened her front door to check if she'd left her garage door open.

ADVERTISING





Replay

Learn more

Standing on her front porch were three men between 5-feet-10 and 6 feet tall dressed in dark clothing and ski masks and armed with guns.

The suspects forced the woman into her home, where they tied her up and started ransacking her house, police said. At one point she was moved to a back room.

She was able to loosen the ties on her hands and then untie her feet. She escaped out a back window and fled to a neighbor's house, where she called police around 11:40 p.m.

But by the time law enforcement arrived, the thieves were gone.

The men stole more than $60,000 worth of property including jewelry, a watch, a couple laptop computers and a high-end purse.

"Based upon the investigation it seems like they've done this before," said Lt. Jim Gavin of the Van Nuys Police Station. "I don't think it's happened in the San Fernando Valley, because I checked with surrounding areas, but that doesn't mean they haven't done it somewhere else."

Gavin said that the area where the robbery took place is relatively isolated. The home has a long driveway and sits by itself.  Police are seeking security video from neighboring houses and commercial establishments that might have captured the suspects entering or exiting the neighborhood.

"There are only a few ways to get in and out of that area," he said. "It would have been difficult for them to escape without being seen."

**ALSO**

**San Francisco cop arrested on suspicion of building illegal AR-15-style rifle**

**Woman linked to kidnapping of Northern California family turns out to be victim of abduction**

**Canadian woman suspected of transporting 83 pounds of heroin is arrested on Central California highway**

Copyright © 2016, Los Angeles Times